[Cite as *State v. Johnston*, 2019-Ohio-5135.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

     Plaintiff-Appellee,              :

                                  No. 18AP-817
v.                                               :        (C.P.C. No. 17CR-818)

Hakeem O. Johnston,                              :        (REGULAR CALENDAR)

     Defendant-Appellant.             :

D E C I S I O N

Rendered on December 12, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, P.J.

{¶ 1} Defendant-appellant, Hakeem O. Johnston, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of aggravated burglary, aggravated robbery, involuntary manslaughter, and felony murder, with associated 54-month firearm specifications as to each, and guilty, pursuant to bench verdict, of having weapons while under disability ("WUD"), with an associated 54-month firearm specification. Because the manifest weight of the evidence supports the verdicts, we affirm.

{¶ 2} In 2017, Laquam Gratsy lived in a two-story house located at 255 South Ogden Avenue. The house was well-known as a "trap house" where persons could buy, sell, and abuse drugs. (Tr. at 179.) Two surveillance cameras mounted at the top left and top right of the front porch captured images of persons entering and exiting the house through the front door, which led to directly into the living room. These cameras also captured images of persons walking along the side of the house near the front door. In addition, a surveillance camera mounted at the top of the back of the second story monitored ingress and egress through the back door, which led directly into the kitchen.

{¶ 3} On January 30, 2017, Michael Reime rode with appellant, known as "Chilli," Devante Harris, known as "Shooter," a man known as "Steve-O," and a man named Max to the Ogden Avenue address. At the time, Reime and Gratsy were good friends; however, Reime had known appellant and Shooter less than a day. Appellant told Reime that a woman at the Ogden house owed him money. Both appellant and Shooter were armed with .40 caliber handguns; appellant's gun had an extended clip.

{¶ 4} The front porch surveillance cameras captured images of the group arriving at the Ogden house at approximately 7:42 p.m.; Reime and the others walked around the side of the house to the back door. (State's Ex. 153-154.) Gratsy's brother, Emilio, immediately permitted Reime to enter the house. The other four men initially were denied entry; however, they eventually were permitted inside. Gratsy and Kiana Bacino were seated at the kitchen table conducting drugs transactions. Marcus Cooley, a homeless crack addict who sometimes worked as a "doorman," regulating traffic in and out of the house in exchange for drugs, was also in the kitchen. (Tr. at 433-34.) Reime and Steve-O walked through the kitchen to the living room, where several young women were abusing drugs. Emilio eventually left the house; however, Gratsy, Bacino, Cooley, appellant, Shooter, and Max remained in the kitchen.

{¶ 5} At some point, appellant, allegedly angry because some of the individuals inside the house owed him money, pulled out his gun and ordered Gratsy, Bacino, and Cooley to lie down on the floor. Gratsy, however, remained seated at the table. After Shooter and Max robbed the others, appellant struck Gratsy in the back of the head with the gun. When Gratsy stood up, appellant again struck him with the gun, this time on the left side of his face. Gratsy, unconscious, fell to the floor, close to Bacino, who had complied

with appellant's order to get on the floor. Appellant then fired one shot at Gratsy, hitting him in the back.

{¶ 6} Reime, still in the living room, heard the gunshot. About five seconds later, appellant entered the living room, held a gun to Reime's face, and told him to get down on the floor. Appellant, Shooter, Max, and Steve-O then ran out of the house through the back door.

{¶ 7} Reime went into the kitchen and observed Gratsy lying face-down on the floor. Reime left the scene because he thought there was an outstanding warrant against him. Paramedics soon arrived and transported Gratsy to the hospital, where he later died.

{¶ 8} During their search of the crime scene, police recovered a single spent .40-caliber shell casing from the kitchen table. No firearms were recovered from the house.

{¶ 9} After performing an autopsy, the coroner determined Gratsy's cause of death to be a "gunshot wound of the back." (State's Ex. 1, Franklin County Coroner Autopsy Report.)

{¶ 10} Within one month of the shooting, the police separately presented Reime, Bacino, and Cooley with two sets of photo arrays. One set included photographs of appellant; the other included photographs of Shooter.[1] All three identified appellant as the individual who shot Gratsy and Shooter as the person who robbed them while appellant held them at gunpoint. More specifically, on January 31, 2017, Reime identified appellant, the man he knew as Chilli, as the person who "shot [Gratsy] at 255 S. Ogden Ave[.] during a robbery." (State's Ex. 143, Tr. at 157-58, 283.) Reime also identified Shooter as the individual who "held people in the house at 255 S. Ogden at gunpoint during a robbery while his accomplish [sic] shot [Gratsy]." (State's Ex. 142, Tr. at 155-56, 281.) On February 5, 2017, Bacino identified appellant as the individual who "shot [Gratsy]." (State's Ex. 144, Tr. at 317, 373-74.) Bacino also identified Shooter as the individual who "patted everyone down, was with other suspect." (State's Ex. 145, Tr. at 320, 373-74.) On February 28, 2017, Cooley identified appellant as "Chilli" and denoted, "I saw him shoot

---

[1] Appellant filed a motion to suppress the identification procedure with regard to the photo arrays as impermissibly suggestive. No hearing was held on the motion. Prior to the jury being impaneled, appellant's trial counsel raised the issue of the pending motion before the trial court. Although the trial court did not expressly deny the motion, it impliedly did so, stating, "I don't see how this isn't just the proper subject of cross-examination, and that's where I'll go. I guess if I hear something else, I will do my best to instruct the jury accordingly." (Tr. at 13.)

the victim." (State's Ex. 147, Tr. at 308, 463-64.) Cooley also identified Shooter as "Chilli's partner." (State's Ex. 146, Tr. at 306, 461-62.)

{¶ 11} By indictment filed on February 9, 2017, appellant was charged with one count of aggravated burglary in violation of R.C. 2911.11, a first-degree felony; one count of aggravated robbery in violation of R.C. 2911.01, a first-degree felony; one count of aggravated murder in violation of R.C. 2903.01, an unclassified felony; one count of murder (purposeful) in violation of R.C. 2903.02, an unclassified felony; one count of murder (felony) in violation of R.C. 2903.02, an unclassified felony; one count of WUD in violation of R.C. 2923.13, a third-degree felony; and one count of kidnapping in violation of R.C. 2905.01, a first-degree felony. All counts included 54-month firearm specifications in violation of R.C. 2941.145(D). In addition, the aggravated burglary, aggravated robbery, aggravated murder, purposeful murder, felony murder, and kidnapping counts included repeat violent offender ("RVO") specifications in violation of R.C. 2941.149(A).

{¶ 12} Appellant waived his right to a jury trial on the WUD. Jury trial on the remaining charges commenced on August 20, 2018. On August 28, 2018, the jury returned verdicts finding appellant guilty of aggravated burglary, aggravated robbery, and felony murder, all with firearm specifications, not guilty of aggravated murder and purposeful murder, but guilty of involuntary manslaughter as a lesser-included offense of aggravated murder, with a firearm specification. The trial court found appellant guilty of WUD with a firearm specification. Upon application of the prosecutor, the trial court entered a nolle prosequi on the kidnapping count. The trial court sentenced appellant on September 19, 2018 to an aggregate term of life imprisonment with parole eligibility after 24 years. The trial court memorialized the conviction and sentence in an amended judgment entry filed on October 11, 2018.

{¶ 13} Appellant timely appeals, assigning the following error:

> The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of murder; aggravated burglary; aggravated robbery; manslaughter; and having weapons while under disability as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.

{¶ 14} Appellant's assignment of error asserts the guilty verdicts for aggravated burglary, aggravated robbery, felony murder, involuntary manslaughter, and WUD were not supported by sufficient evidence and were against the manifest weight of the evidence. However, appellant fails to identify a single element of any of these offenses that the state failed to prove or even argue that the state's evidence was insufficient. Rather, the crux of his argument is that the state's evidence was not reliable, credible, or consistent. Appellant specifically contends that the "[t]he State's case in this matter rested on the testimony of two convicted felons and a person whose testimony defies belief." (Appellant's brief at 2.) Because appellant's argument relates solely to the manifest weight of the evidence, we will address it accordingly. *See* App.R. 16(A)(7) and 12(A)(2).

{¶ 15} The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983); *State v. Strider-Williams,* 10th Dist. No. 10AP-334, 2010-Ohio-6179, ¶ 12.

{¶ 16} In addressing a manifest-weight challenge, we are able to consider the credibility of the witnesses. *State v. Cattledge,* 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. "However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman,* 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings,* 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55.

{¶ 17} Here, the state presented the testimony of Reime, Bacino, and Cooley, all of whom were present at the time of the offenses and were victims of the robbery. Reime, who rode to the Ogden house with appellant, testified that appellant and his accomplice, Shooter, were armed with .40 caliber handguns and that appellant averred that someone at the house owed him money. All three of the victims testified that no one inside the house other than appellant and Shooter were armed. Bacino and Cooley both testified that they were in the kitchen when appellant pulled out his gun and ordered them to lie on the floor while his accomplices, Shooter and Max, took money and other personal possessions from them. Both testified that appellant twice struck Gratsy with his gun and then shot him once in the back. Reime testified that he was in the living room when he heard a gunshot; approximately five seconds later, appellant entered the living room, held a gun on Reime, and ordered to him lie on the floor.

{¶ 18} The state also presented video evidence from the surveillance cameras, which captured images of appellant and the others arriving at the house at approximately 7:42 p.m. Reime identified the individuals on the surveillance video by name, including appellant. Reime also identified still photographs of the images captured on the surveillance video. (State's Ex. 158-162.) The state also presented evidence that within one month of the shooting, Reime, Bacino, and Cooley separately identified appellant as the individual who shot Gratsy.

{¶ 19} Appellant contends Reime was not a credible witness because he had prior felony convictions and was in prison at the time of trial. Reime candidly admitted that he had been out of prison only three weeks before Gratsy was shot and that he was incarcerated at the time of trial. Defense counsel had ample opportunity to challenge Reime's credibility and motivation for testifying through cross-examination. Indeed, defense counsel challenged Reime's credibility through questioning which forced Reime to reiterate that he had been out of prison only three weeks before the shooting. As to Reime's motivation for testifying, the record contains no evidence establishing that Reime and the prosecution had negotiated a deal related to his current incarceration in exchange for providing testimony against appellant. Finally, we note that the jury was specifically instructed that testimony tending to show that a witness had been convicted of a crime could be considered in judging the witness's credibility and the weight to be afforded the witness's testimony. We presume

the jury followed this instruction. *State v. Greene*, 10th Dist. No. 17AP-238, 2019-Ohio-4010, ¶ 76. Thus, the jury was in the best position to determine for itself the effect of Reime's prior convictions and current incarceration on his credibility.

{¶ 20} Appellant further contends that Reime's assertion that appellant shot Gratsy was inconsistent with a statement he provided to police on the night of the shooting. Columbus Police Detective Amy Welsh testified in appellant's case that she interviewed Reime on the night of the shooting. She both recorded and prepared a report of the interview. Although Welsh testified that the recording was lost and she could not recall the details of the interview or the contents of the report, she acknowledged that the report indicated that Reime said Shooter shot Gratsy while appellant held Reime and the others at gunpoint. When defense counsel cross-examined Reime about the statement contained in the report, Reime denied making it. Specifically, Reime testified that he "never pinpointed who shot who because I wasn't in the room" and "I never said who did it because I didn't see who did it. I wasn't in the room." (Tr. at 205-06.) While a jury may take note of inconsistencies in the evidence and resolve or discount them accordingly, such inconsistencies do not render an accused's conviction against the manifest weight of the evidence. *State v. Loomis,* 10th Dist. No. 17AP-843, 2019-Ohio-2576, ¶ 54.

{¶ 21} Appellant also challenges Cooley's credibility on grounds that he was a convicted felon, was incarcerated at the time of trial, and admitted to smoking crack cocaine throughout the evening prior to the shooting. Cooley openly admitted these facts and defense counsel had ample opportunity to challenge his credibility based on these issues. Defense counsel did so through questioning about Cooley's crack cocaine use and the fact that he was "high" on the night in question. (Tr. at 468.) Thus, the jury was aware that Cooley had smoked crack cocaine and it was within the province of the jury to take his drug use into consideration when assessing his credibility. *Loomis* at ¶ 53 (jury was aware that witnesses had consumed alcohol and it was within province of jury to take the witnesses' alcohol consumption into consideration when weighing the evidence and assessing the witnesses' credibility). Defense counsel also put Cooley's credibility at issue via questioning which challenged his statement that he was not armed that night and never carried a gun through eliciting an admission from Cooley that he had a 2012 WUD conviction. Moreover, the record contains no evidence establishing that Cooley offered his testimony in exchange

for favorable treatment related to his current incarceration. We reiterate that the jury was instructed that it could consider Cooley's incarceration in assessing his credibility and the weight to be afforded his testimony. The jury could thus determine for itself the effect of Cooley's prior conviction, his current incarceration, and his drug use on his credibility.

{¶ 22} Appellant further contends that Cooley's assertion that Gratsy was seated in a chair when appellant shot him conflicted with Bacino's testimony that Gratsy was lying on the floor when appellant shot him. Although their testimonies may have contained differences as to Gratsy's position when he was shot, both testified that appellant shot Gratsy in the kitchen of the Ogden house. This inconsistency in the testimony did not render appellant's convictions against the manifest weight of the evidence.

{¶ 23} Appellant also asserts that Cooley's testimony concerning his own location in the kitchen at the time of the shooting was unclear, leaving open the possibility that his view of the shooting would have been obstructed if he were lying on the floor. Appellant does not direct this court to the portion of testimony upon which he relies for this argument. *See* App.R. 16(A)(7) and 12(B)(2). However, our review of Cooley's testimony reveals that he was not lying on the floor when Gratsy was shot. Cooley testified that "when I heard that one shot, I hit the floor. Everything just went blank. And next thing you know, him and his bud Shooter told everybody to get on the ground, told everybody to give up the money, the dope, pretty much took everything from everybody." (Tr. at 440.) Further, even if Cooley's testimony on this point could be construed as being unclear, or inconsistent with other testimony, his testimony identifying appellant as the person who shot Gratsy was clear and unwavering.

{¶ 24} Appellant next contends that Bacino's testimony was "questionable." (Appellant's brief at 3.) Appellant specifically points to Bacino's testimony that she had never seen drug activity at the Ogden house, including on the night of the shooting. This testimony clearly conflicts with the testimony of Reime and Cooley that Gratsy ran a drug trafficking operation out of the Ogden location. Indeed, Cooley testified that Bacino and Gratsy were conducting drug operations in the kitchen and that Bacino supplied him with the crack cocaine he smoked that night. Given the testimony of Reime and Cooley, the jury may have disbelieved Bacino's testimony on this particular point. The jury may take note of inconsistencies in testimony and resolve or discount them accordingly "believ[ing] all,

part, or none of a witness's testimony." *State v Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶ 25} Appellant also characterizes Bacino's testimony as "troubling" regarding her claim that she witnessed the shooting from her position on the floor under the kitchen table. (Appellant's brief at 4.)  Bacino explained in detail where she was on the floor and averred that she "was looking right at [appellant], right in his eyes the whole time" when he shot Gratsy.  (Tr. at 365)  Defense counsel had ample opportunity to cross-examine Bacino and challenge her declaration that she could see appellant shoot Gratsy from her vantage point on the floor.   As noted above, determining the credibility of the witnesses is primarily for the trier of fact, and we must afford great deference to such determinations.  *Redman,* 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26.

{¶ 26} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses and conflicts in the evidence, we cannot find that appellant's convictions were such that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   Accordingly, appellant's sole assignment of error is overruled.

{¶ 27} Having overruled appellant's assignment of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and BRUNNER, JJ., concur.